# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 05-1152

_____

|  |  |  |
|---|---|---|
| Donald Weems; Michael Briggs, | * | |
| | * | |
| Plaintiffs/Appellants, | * | |
| | * | |
| Tony Allen Lampkin, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| Little Rock Police Department, | * | |
| | * | |
| Defendant, | * | |
| | * | |
| Lawrence Johnson, In his official | * | Appeal from the United States |
| capacity as Chief of Police, Little | * | District Court for the |
| Rock Police Department, | * | Eastern District of Arkansas. |
| | * | |
| Defendant/Appellee, | * | |
| | * | |
| Pine Bluff Police Department, | * | |
| | * | |
| Defendant, | * | |
| | * | |
| Daniel Moses, In his official capacity | * | |
| as Chief of Police, Pine Bluff Police, | * | |
| | * | |
| Defendant/Appellee, | * | |
| | * | |
| Arkansas Department of Correction, | * | |
| Sex Offenders Assessment Committee | * | |
| and Sex Offender Screening and Risk | * | |

Assessment,                                    *
                                               *
                Defendant,                     *
                                               *
Larry B. Norris, In his official capacity      *
as Director, Arkansas Department of            *
Correction; Paula Stitz, In her official       *
capacity as Chairperson of the Arkansas        *
Sex Offenders Assessment Committee;            *
G. David Guntharp, In his official             *
capacity as Director of Arkansas               *
Department of Community Correction;            *
Sheri Flynn, In her official                   *
capacity as administrator of Sex               *
Offender Screening and Risk                    *
Assessment (originally sued as John            *
Doe),                                          *
                                               *
                Defendants/Appellees.          *

_____

Submitted: October 10, 2005
Filed: July 13, 2006

_____

Before RILEY, HANSEN, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Donald Weems and Michael Briggs, registered sex offenders living in Arkansas, brought this action pursuant to 42 U.S.C. § 1983. They challenged provisions of the Arkansas Sex Offender Registration Act that require sex offenders to register with the State as well as a criminal statute that prohibits certain registered sex offenders from living within two thousand feet of a school or daycare center. The

district court[1] granted defendants' motions to dismiss for failure to state a claim and denied plaintiffs' motion for class certification. We affirm.

## I.

In 1997, the Arkansas General Assembly enacted the Sex & Child Offender Registration Act. The General Assembly determined that "sex offenders pose a high risk of reoffending after release from custody," that "protecting the public from sex offenders is a primary governmental interest," that "the privacy interest of persons adjudicated guilty of sex offenses is less important than the government's interest in public safety," and that "the release of certain information about sex offenders to criminal justice agencies and the general public will assist in protecting the public safety." Ark. Code Ann. § 12-12-902. The Act, now titled the Sex Offender Registration Act, *id*. § 12-12-901, requires registration by any person adjudicated guilty of, or serving a sentence for, a "sex offense" as defined in § 12-12-903(12); any person who has committed a sex offense but was institutionalized or acquitted on grounds of a mental disease; and any person previously required to register under the Habitual Child Sex Offender Registration Act. *Id*. § 12-12-905(a). A person who sustained a conviction for a sex offense in another State and subsequently moved to Arkansas is likewise required to register. *Id*. § 12-12-906(a)(2)(A). Sex offenders required to register must provide name and address, employment information, a statement of the crime or crimes committed, and other demographic data. *Id*. § 12-12-908(b).

In 1999, the legislature amended the Sex Offender Registration Act to provide for the establishment of a Sex Offender Assessment Committee, a committee appointed by the governor and charged with "promulgat[ing] guidelines and

---

[1]The Honorable Susan Webber Wright, Chief Judge, United States District Court for the Eastern District of Arkansas.

procedures for the disclosure of relevant and necessary information regarding sex offenders to the public." *Id.* § 12-12-913(c)(1)(A); *see id.* § 12-12-921. The guidelines and procedures are to regulate the scope of information disclosed to the community, depending upon the sex offender's level of dangerousness, the sex offender's pattern of offending behavior, and the extent to which the information will enhance community safety. *Id.* § 12-12-913(c)(2)(B).

The 1999 Amendments also require sex offenders to undergo a risk assessment designed to predict future risk that the offender will recidivate. The Committee is charged with identifying "factors relevant to a sex offender's future dangerousness and likelihood of reoffense or threat to the community." *Id.* § 12-12-913(c)(2)(A). The guidelines promulgated by the Committee define four levels of risk: low, moderate, high, and sexually violent predator. *The Sex Offender Guidelines & Procedures for Implementing Risk Assessment & Cmty. Notification Regarding Sex Offenders*, at 13-14 (hereafter "*Guidelines*"), *reprinted in* J.A. at 50-51. The Guidelines provide for broader disclosure of information to the public as the risk level increases. *Id.* at 19-21.

Examiners performing risk assessments for sex offenders consider "actuarial analyses, information obtained from interview, psychological testing and evaluation, review of relevant records and historical data, and [a] polygraph or penile plethysmograph." *Id.* at 9. Using information gathered from the assessment, examiners determine the applicable level of risk, with one exception. Ark. Code Ann. § 12-12-917(b)(1), (e). Examiners do not have authority to categorize sex offenders as Level 4, sexually violent predators. This categorization can be made only by the sentencing court, *id.* § 12-12-918, with the examiner's role limited to providing a report recommending to the court whether to categorize the offender as a sexually violent predator. *Id.* § 12-12-917(a)(1).

Offenders may challenge their assigned risk level by submitting a written request for administrative review. *Id*. § 12-12-922(b)(1)(A). Under this procedure, the offender may request copies of all documents generated by the examiners, a listing of all documents that may be available from other agencies, and a copy of the tape of the interview. *Id*. § 12-12-922(b)(1)(B). A member of the Committee is assigned to conduct the administrative review within 30 days of receiving a request for review. *Id*. § 12-12-922(b)(6)(A). The member may set aside the assigned risk level if it is not supported by substantial evidence, if the governing rules and procedures were not properly followed, or if there is new information that has a bearing on the risk that the sex offender poses to the community. *Id*. § 12-12-922(b)(3)(B). Until administrative review is completed, notification to the community of an offender's assigned risk status shall be made "only at the level immediately below the level upon which review has been requested." *Id*. § 12-12-922(b)(5). Community notification commences five calendar days after the Committee mails the finding of the administrative review to the offender. *Id*. § 12-12-922(7)(A)(i)

If the administrative review does not alter the assigned risk level, the sex offender has the right to file a petition for judicial review in an Arkansas circuit court, pursuant to the Arkansas Administrative Procedure Act. *Id*. § 12-12-922(b)(7)(A)(ii). The filing of a petition does not automatically stay community notification, but the reviewing court "may do so upon such terms as may be just." Ark. Code Ann. § 25-15-212(c). The Arkansas APA provides that the court may reverse or modify the decision of the Committee if it is in violation of constitutional or statutory provisions, in excess of the agency's statutory authority, made upon unlawful procedure, affected by other error or law, not supported by substantial evidence in the record, or arbitrary, capricious, or characterized by abuse of discretion. *Id*. § 25-15-212(h).

In 2003, the Arkansas General Assembly enacted a residency restriction for Level 3 "high risk" offenders and Level 4 "sexually violent predators." Offenders in these classes are not permitted "to reside within two thousand feet (2,000') of the

property on which any public or private elementary or secondary school or daycare facility is located." Ark. Code Ann. § 5-14-128(a). The statute excludes from the residency restriction any Level 3 or 4 offender residing in a property he owned and occupied before the school or daycare center opened or before July 16, 2003. *Id*. § 5-14-128(b)(1), (c)(1). But if an offender who satisfies one of the exceptions commits another sexual offense either after July 16, 2003, or after a new school or daycare center opens, he is no longer exempt. *Id*. § 5-14-128(b)(2), (c)(2). A sex offender who is required to register and knowingly violates the residency restriction is guilty of a Class D felony. *Id*. § 5-14-128(d).

Weems was found guilty of indecent exposure in Pulaski County, Arkansas, on March 7, 2000. Indecent exposure is a sex offense that subjects Weems to the registration and assessment requirements, and an examiner assessed Weems as a Level 3, high risk offender. After serving a one-year prison term, Weems moved into housing in Little Rock in May 2001. Weems received a letter dated February 28, 2004, from the Chief of Police in Little Rock, advising him that he was in violation of the 2000-foot residency restriction, and ordering him to relocate.

Briggs was found guilty of first-degree rape in Hartford County, Maryland, in 1986. In March 2001, after serving fifteen years of his sentence, Briggs moved into his mother's house, located in Pine Bluff, Arkansas, and established permanent residence there. Pursuant to the Registration Act, Briggs registered and underwent a risk assessment, after which he was assessed as a Level 3 risk. On April 8, 2004, Briggs received notice that by living in his mother's home, he was in violation of the residency restriction and was required to relocate.

Weems and Briggs challenge the constitutionality of both the Registration Act and the residency restriction. They alleged in the district court that the statutes violate the doctrines of substantive and procedural due process. They also asserted that the Registration Act and Guidelines are unconstitutionally vague, that the residency

restriction violates their equal protection rights by treating property owners and Level 1 and 2 sex offenders differently than non-property owning Level 3 and 4 offenders, and that the residency restriction violates their substantive due process rights to reside with family members and to unrestricted interstate and intrastate travel. They further alleged that the residency restriction is an unconstitutional *ex post facto* law that retroactively punishes sex offenders who committed their crimes before July 16, 2003.[2]

The district court granted the defendants' motion to dismiss for failure to state a claim. Although it found that the plaintiffs' interests in their reputation and privacy are substantial, the district court, applying *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976), held that the Due Process Clause does not require the State to extend the rights to counsel and to confront witnesses to the risk assessment process, and that Arkansas provided sufficient procedures. The court also concluded that the Registration Act is not unconstitutionally vague, that the residency restriction does not violate the equal protection rights of non-property owning Level 3 and 4 sex offenders, that the Act and residency restriction do not violate sex offenders' substantive due process rights, and that the residency restriction does not violate the *Ex Post Facto* Clause.

## II.

We recently considered several issues raised by Weems and Briggs in connection with an Iowa statute that imposed a residency restriction for certain sex offenders. *Doe v. Miller*, 405 F.3d 700 (8th Cir.), *cert. denied*, 126 S. Ct. 757 (2005). In *Miller*, as relevant here, we held that an Iowa statute that included a 2000-foot residency restriction did not violate the substantive due process rights or right to intrastate travel of sex offenders, and did not constitute an unconstitutional *ex post*

---

[2]Weems and Briggs also asserted that the Registration Act was inconsistent with the Confrontation Clause of the Constitution. This contention is not raised on appeal.

*facto* law. The Iowa statute differed from the Arkansas law in two principal ways. The Iowa statute was narrower in that it applied only to offenders convicted of sex offenses against minors, while the Arkansas law applies to some sex offenses in which adults were victimized. The restrictions of the Iowa statute affected offenders more broadly, however, because they applied to every sex offender convicted of an enumerated offense, without any individualized assessment. As explained, the Arkansas statute provides for an administrative process to assign a risk level to each offender on a case-by-case basis. Despite these differences, the principles discussed in *Miller* are highly instructive with respect to several of the claims raised by Weems and Briggs in this case.

Like the sex offenders in *Miller*, Weems and Briggs assert that the Arkansas residency restriction violates their rights under the doctrine of substantive due process, because the statute, in their view, infringes on a constitutional right "to reside in a certain place, i.e., with family members." In *Miller*, we rejected a similar appeal to precedents involving "intimate human relationships," *see Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984); *Griswold v. Connecticut*, 381 U.S. 479, 485-86 (1965), and concluded that a comparable residency restriction did not implicate any fundamental right of the sex offenders that would require strict scrutiny of the statute. *Miller*, 405 F.3d at 709-10. We reasoned that because the statute did not "operate directly on the family relationship," *id*. at 710, the residency restriction did "not infringe upon a constitutional liberty interest relating to matters of marriage and family in a fashion that requires heightened scrutiny." *Id*. at 711; *accord State v. Seering*, 701 N.W.2d 655, 663-65 (Iowa 2005); *see also Bowen v. Gilliard*, 483 U.S. 587, 598-603 (1987); *Lyng v. Castillo*, 477 U.S. 635, 638 (1986).

Our holding in *Miller* controls the level of scrutiny applicable to the Arkansas residency restriction. Because the residency restriction does not infringe upon a "fundamental right," we consider only whether the statute rationally advances some legitimate government purpose. *Miller*, 405 F.3d at 714. The Arkansas legislature

undoubtedly has a legitimate interest in protecting children from the most dangerous sex offenders, *see Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 4 (2003), and we believe that a residency restriction designed to reduce proximity between the most dangerous offenders and locations frequented by children is within the range of rational policy options available to a state legislature charged with protecting the health and welfare of its citizens. *Miller*, 405 F.3d at 714-16. Indeed, Weems and Briggs rest their substantive due process argument entirely on the proposition that strict scrutiny should apply. We therefore conclude that the Arkansas statute does not contravene the doctrine of substantive due process.

Appellants next contend that the residency restriction violates the Equal Protection Clause of the Fourteenth Amendment because it treats non-property owning Level 3 and 4 sex offenders differently from property owners or Level 1 and 2 offenders. They argue that the residency restriction interferes with a "fundamental right to acquire, enjoy, own and dispose of property," such that it is subject to strict scrutiny. The district court concluded that as long as the statute was rationally related to a legitimate state interest, the residency restriction did not deprive appellants of the equal protection of the laws.

We agree with the district court that the rational basis standard of review applies to this equal protection claim. The distinctions drawn by the Arkansas statute are not based on a suspect classification such as race or religion, *cf. Shelley v. Kraemer*, 334 U.S. 1 (1948), and the statute does not implicate a "fundamental right" under equal protection jurisprudence, such as the right to vote. *Cf. Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626-27 (1969). Outside of these two categories, rationality review governs statutory classifications based on property ownership. *See Nordlinger v. Hahn*, 505 U.S. 1, 10-11 (1992); *WMX Technologies, Inc. v. Gasconade County, Mo.*, 105 F.3d 1195, 1198-99 (8th Cir. 1997). For reasons previously discussed, we further agree with the district court that the residency restriction applied

to high risk offenders and sexually violent predators is rationally related to the State's legitimate interest in protecting the safety of children. *See Miller*, 405 F.3d at 714-16.

Weems and Briggs also contend that the residency restriction infringes on a constitutional right to intrastate travel. We rejected an identical contention in *Miller*, where we held that even assuming such a right is recognized, it would not be implicated by a residency restriction for sex offenders. *Id*. at 713. We observed that the Iowa residency restriction did not "prevent a sex offender from entering or leaving any part of the State," and it did not "erect any actual barrier to intrastate movement." *Id*.

Appellants contend that the Arkansas law is more restrictive than the Iowa statute, because the Registration Act defines "residency" to include "place of employment, training, or education." Ark. Code Ann. § 12-12-903(10)(B). A sex offender must register if he "establishes residency" in Arkansas. Thus, if a sex offender lives in a neighboring State, but works or attends school in Arkansas, then the offender must comply with the Registration Act. This requirement serves the purpose of notifying the community that a sex offender is within a particular municipality or county on a regular basis.

The definition of "residency" for purposes of registration in section 12-12-903(10)(B), however, appears in a different chapter of the Arkansas Code than the residency restriction, and the definition does not by its terms apply to the criminal statute that makes it unlawful for a sex offender "to reside" within 2000 feet of a school or daycare facility. Ark. Code Ann. § 5-14-128(a). Chapter 5 does not define the term "reside," and we do not assume that the General Assembly and the Governor necessarily intended to apply the broad definition of "residency" when crafting a restriction on where a sex offender may "reside." There is no indication in this record that the State has moved to enforce the residency restriction to prohibit sex offenders from working or studying within 2000 feet of a school or daycare center, and we see

no good reason to create more difficult constitutional questions by adopting a broad construction that the State itself eschews. We thus employ the normal rule that terms are given "their ordinary and usually accepted meaning," *Williams v. State*, 67 S.W.3d 548, 556 (Ark. 2002), and we construe "reside" to mean "to dwell permanently or continuously." *Webster's Third New International Dictionary* 1931 (2002). On this understanding, the residency restriction in Arkansas is no broader than the restriction at issue in *Miller*, and for the same reasons discussed there, we conclude that the Arkansas law does not infringe on a constitutional right to intrastate travel. 405 F.3d at 713.

Weems and Briggs also argue that the Arkansas residency restriction constitutes an unconstitutional *ex post facto* law as applied to offenders who sustained convictions prior to the enactment of the statute. We addressed this same argument in *Miller*, and concluded that Iowa's residency restriction was not so punitive in purpose or effect to negate the legislature's intent to create a civil, non-punitive regulatory scheme. 405 F.3d at 718-23; *accord Seering*, 701 N.W.2d at 667-69.

As with the Iowa law, we conclude that the Arkansas General Assembly intended to create a civil, non-punitive regulatory scheme when it enacted the residency restriction. The General Assembly first passed the Registration Act, finding specifically that "protecting the public from sex offenders is a primary governmental interest," and that the "release of certain information about sex offenders to criminal justice agencies and the general public will assist in protecting the public safety." Ark. Code Ann. § 12-12-902. The Supreme Court of Arkansas then held that the General Assembly's intent in enacting the Registration Act was to protect public safety, and not to punish sex offenders. *Kellar v. Fayetteville Police Dep't*, 5 S.W.3d 402, 407 (Ark. 1999). The residency restriction was enacted as part of a bill relating to sex offender registration, including amendments to the Registration Act, 2003 Ark. Acts 330, and it works in tandem with the registration requirement. By its terms, the residency restriction applies to certain offenders who are "required to register under

-11-

the Sex Offender Registration Act," and who are classified as "high risk" or "sexually violent predators" under the Act and Guidelines. Ark. Code Ann. § 5-14-128(a). As in *Miller*, we believe that the available evidence leads most naturally to the inference that the residency restriction, like the registration requirements, were intended to protect the public safety, and that the purpose of the Arkansas General Assembly was regulatory and non-punitive. *See Miller*, 405 F.3d at 719.

In considering whether the Arkansas residency restriction is nonetheless so punitive in effect as to negate the legislature's intent to create a civil, non-punitive regulatory scheme, we believe that Arkansas law is on even stronger constitutional footing than the Iowa statute. Unlike the Iowa law, the Arkansas statutory plan calls for a particularized risk assessment of sex offenders, which increases the likelihood that the residency restriction is not excessive in relation to the rational purpose of minimizing the risk of sex crimes against minors. This fine-tuning of the restriction addresses the principal concern of the dissenting judges who believed the Iowa statute violated the *Ex Post Facto* Clause. *Miller*, 405 F.3d at 725-26 (Melloy, J., concurring and dissenting); *Seering*, 701 N.W.2d at 672 (Wiggins, J., concurring in part and dissenting in part). Because the other factors in the *ex post facto* analysis here are comparable to those discussed in *Miller*, 405 F.3d at 719-21, and the "rational connection" of the residency restriction is even closer to a nonpunitive purpose, we conclude that the Arkansas statute is not an unconstitutional *ex post facto* law.

Finally, citing the distinctions among sex offenders based on the assessment of risk levels, Weems and Briggs raise a procedural due process challenge to the Arkansas statute and guidelines. They contend that the risk assessment determination and the resulting notification to the community deprive them of a liberty interest without due process of law. Assuming for purposes of analysis that appellants have a constitutionally-protected liberty interest in avoiding the risk assessment and its consequences, either by virtue of the Fourteenth Amendment or by creation of state law, we conclude that the procedures established by Arkansas are adequate.

-12-

Considering the private interest affected by the State's actions, the risk of erroneous determinations under current procedures and the probable value of any additional safeguards, and the State's interest in risk assessment and community notification, including the fiscal and administrative burdens of additional procedures, *see Mathews v. Eldridge*, 424 U.S. at 335, we hold that the existing procedures comport with the Constitution.

Before a team operating under the oversight of the Sex Offender Assessment Committee may assign a risk level to an offender, the team conducts a thorough review of official records and historical data, performs psychological testing and evaluation, undertakes actuarial analyses, and conducts a personal interview with the offender. The offender has an opportunity to be heard through the interview, and may access most records and information maintained by the committee. Ark. Code Ann. § 12-12-917(d)(2)(A). The examination team typically follows an actuarial prediction model based on objective criteria, but the Guidelines do permit "some flexibility" to account for "special circumstances" of a particular case that are not adequately considered in the model. These "overrides" and "departures" permit the examiners to increase or decrease the assigned level based on special circumstances. *Guidelines*, at 14-15. Any such adjustment must be "fully documented," and it is subject to review by the Sex Offender Assessment Committee. *Id*. at 15.

The State has a strong interest in protecting children from dangerous offenders through a process that is efficient and practical. While sex offenders have an interest in avoiding inaccurate community notification or an unwarranted residency restriction, the Guidelines do not permit notification of a "high risk" assessment, which triggers the residency restriction and may bring greater opprobrium than notification in accordance with Level 1 or 2 status, until after the conclusion of an administrative review.[3] Prior to this review, the risk of erroneous deprivation is negligible. Although

---

[3]The residency restriction applies to a sex offender after he "has been assessed" as a Level 3 or Level 4 offender. Ark. Code Ann. § 5-14-128(a). The statute is

examiners believe that the offender is a "high risk," the community may be notified only that the offender presents a "moderate risk," and the offender's criminal record – which almost certainly implies at least some level of risk – is already a matter of public record. The administrative review then ensures that the sex offender's assessment is considered by both the examination team and the Sex Offender Review Committee before a Level 3 assessment is implemented.

Weems and Briggs complain primarily that the procedures do not afford the "rigors of an adversarial process," including a right to counsel and to confront witnesses against them, and that the risk assessment process includes "undefined and non-specific overrides and departures." We are not persuaded that these features make the process constitutionally inadequate. The Committee's assessment is designed to be thorough and complex, drawing on historical records, psychological evaluations, and actuarial techniques. Deviations from the actuarial prediction models are designed to be "used sparingly," only with the approval of "senior clinical staff," and are subject to review by the Sex Offender Assessment Committee. *Guidelines*, at 14-15. These "overrides" and "departures" are not necessarily unfavorable to an offender; they may either increase or decrease the risk level assigned. Given the difficulty of predicting human behavior and the numerous variables that may influence a professional's predictive judgment in a particular case, we do not think the authority to vary from the actuarial models or the absence of a precise listing of circumstances that will justify a variance are unconstitutionally vague or otherwise inconsistent with

indefinite about when, in the course of the assessment process, an offender should be deemed "assessed." Because the applicability of the residency restriction is defined with reference to the requirements of the Registration Act, we think the better reading is that the restriction does not take effect until community notification at Level 3 is authorized under the Registration Act. This interpretation is consistent with the State's representation to the district court that "there is nothing preventing a person appealing a level 3 assessment from residing near a school or daycare while . . . an appeal is pending." (State Def's Br. in Supp. of Mot. to Dismiss Am. Compl., at 14; J.A. at 364).

the tenets of procedural due process. Indeed, it is just as likely that the flexibility to consider individual circumstances in special cases, rather than to follow a rigid actuarial model in every case, actually *reduces* the risk of an erroneous deprivation.

Nor do we believe that a right to counsel or to confront witnesses at the initial assessment stage is constitutionally mandated. Given the focus of the process on psychological evaluations and clinical judgments, it is unlikely that those procedural mechanisms would appreciably reduce the risk of an erroneous determination, while they would entail rather significant fiscal and administrative burdens. *See Bohn v. County of Dakota*, 772 F.2d 1433, 1438-39 (8th Cir. 1985). The Registration Act does provide for an adversarial judicial review of the Committee's administrative review decision, with the full procedural guarantees set forth in the Arkansas Administrative Procedure Act. Ark Code Ann. §§ 12-12-922(b)(7)(A)(ii); 25-15-212(f), (g).

We recognize that under amendments to the Registration Act approved in April 2006, judicial review is not available until after community notification and the residency restriction have taken effect for offenders assessed at Level 3. 2006 Ark. Acts 1st Extraordinary Sess. 4. Nonetheless, the Due Process Clause does not require that all procedural protections be afforded prior to a deprivation, *see Parratt v. Taylor*, 451 U.S. 527, 540 (1981), and we believe that the combination of *ex ante* procedures (initial assessment and administrative review) and *ex post* procedures (judicial review) are sufficient to satisfy the requirements of due process. *See Bohn*, 772 F.2d at 1438-39. The offender is entitled to one layer of review before the Level 3 assessment is put into effect, and this administrative review by the Committee reduces the risk of erroneous determination by the examiners. The State has a strong interest in the protection of children from sex offenders who are likely to recidivate, and the delay in notification and residency restriction that would be required to await completion of judicial review thus impairs the State's legitimate interests. Under the flexible *Mathews* factors, we believe that the procedural avenues afforded by the Arkansas statutes are constitutionally adequate.

The Arkansas statute and guidelines provide notice to sex offenders of the risk assessment process and give them a meaningful opportunity to be heard. The program adequately balances the substantial interests of the State in protecting children and the interests of the offenders in avoiding an erroneous risk assessment, while providing reasonable procedures designed to ensure an accurate classification. We hold that the statutes and guidelines are consistent with the Due Process Clause.

*        *        *

For the foregoing reasons, the judgment of the district court is affirmed.

_____