BRANDON J. HARRISON, Judge
Jordan Shaw appeals the decision of the Arkansas Department of Human Services *927 (DHS) to place his name on the Child Maltreatment Central Registry (the Registry). He argues that the agency's decision is not supported by substantial evidence and is arbitrary and capricious. We disagree and affirm.
On 3 March 2016, the child-abuse hotline received a report of suspected child maltreatment. The alleged victim was thirteen-year-old D.D., and the alleged offender was Shaw. Investigator Pamela Meeks with the Arkansas State Police Crimes Against Children Division (CACD) investigated the allegation, and based on her investigation, Meeks made a true finding of maltreatment, specifically sexual abuse. Shaw appealed to the Office of Appeals and Hearings (OAH) and requested an administrative hearing to determine whether a preponderance of the evidence existed to support the CACD's findings.
The administrative law judge (ALJ) conducted a hearing on 15 August 2016. D.D. testified that she was now fourteen years old and that she met Shaw through a friend in December 2015. She said that they first met "through the phone" and then met in person for the first time at her house. At that time, she was thirteen years old, and he was seventeen. D.D. testified that they "did sexual things" and later clarified that they had vaginal and oral sex. After Shaw turned eighteen, they had sex two more times; one encounter occurred on March 1. On that date, he sent her a text and asked if she wanted to skip school, and she agreed. Shaw picked her up from middle school, and they had sex in his car. D.D. then received a phone call from her mother, and Shaw dropped D.D. off at a gas station, where her stepfather picked her up. After returning to school, D.D. admitted that she had been with Shaw but did not admit to having sex with him. She later told her mother about having sex with Shaw, including the time that she and Shaw had sex at her house.
C.O., D.D.'s eleven-year-old younger brother, testified that he saw Shaw in his sister's room during Christmas break. C.O. said that it was around 11:00 a.m. and that his parents were at work. He said that his grandma had called to see if he and D.D. wanted something to eat, and when he went into D.D.'s room, he saw her and Shaw in bed without any clothes on. He said Shaw got out of bed, put his clothes on, and left. But when asked if the man seated at the defense table was the same person he had seen in his sister's room, C.O. responded, "No." He later added, "Well I didn't really see his face."
Mandy Owen, D.D.'s mother, testified that she dropped D.D. off at school on 1 March 2016, but a short time later received a phone call from the school telling her that D.D. was not there. Owen immediately called D.D.'s cell phone, but she did not answer. Owen said that D.D. finally answered a call from Owen's husband, who picked D.D. up at a gas station. D.D. was very defensive and initially would not tell Owen what was going on, but D.D. finally told her that Shaw had been picking her up from school and taking her to track practice. D.D. also told her mother that Shaw had picked her up that morning and that they had sex. Owen said she "had no idea any of it was going on until that day." She also described D.D. as "sneaky" and said that she was "very good at figuring out the WIFI password and getting on social media when she's not supposed to."
Mark Jelks, the White Hall High School principal, testified that Shaw was a senior in March 2016. Jelks said that he did not know if Shaw was at school on March 1 but that he was not marked absent. Jelks also said that Shaw presented a note from his grandmother on March 1 that read: "To Whom It May Concern, please excuse Jordan *928 Shaw from being late from school due to inclimate [sic] weather." But on that same date Jelks talked to Shaw, who told him that "he had come to school late and was tired and stopped and took a nap or something." On cross-examination, Jelks said that Shaw was not absent on March 1 but that he was late getting to school. Jelks thought that Shaw had arrived "a little bit after nine." On redirect, however, Jelks identified the attendance record for March 1, which showed that Shaw was excused from first, second, and third periods, or until approximately 11:10 a.m. Upon questioning by the ALJ, Jelks clarified that based on the attendance record, Shaw "was probably not at school until sometime during third period."
Carla Thomas, a sexual-assault nurse examiner with the Pine Bluff Children's Advocacy Center, testified that she completed a sexual-assault examination on D.D. on 3 March 2016 and that the results were indicative of sexual assault. D.D. also told Thomas that she had sex with Shaw. On cross-examination, Thomas said that she completed a sexual-assault kit, including a combing of the vaginal area and a DNA swab, and that the kit had been picked up by the police.
In addition to this testimony, the ALJ received documentary evidence including summaries of interviews conducted by the police and the CACD investigator. One summary noted that Shaw was read his Miranda rights but refused to be interviewed by police on 3 March 2016. A summary of Meeks's interview with Officer Brian Todd stated:
On 4/11/16 at 3:47 p.m. Inv. Pamela Meeks spoke to Officer Brian Todd with White Hall PD. Off Todd stated that Jordan Shaw did speak with Officer Monk on 3/1/16. He states that they did not interview Jordan regarding the alleged incident with DD because it did not happen in their jurisdiction and he had not been Mirandized. Off Todd stated that Off Monk did advise Jordan that DD wanted her ID and keys back. He states that Jordan denied that he had been with DD and stated he did not know the girl and did not know what they were talking about. Off Todd stated that Jordan said he overslept and his grandma wrote him a note. Note: This is different from what Jordan told the principal (that he took a nap on the side of the road that morning and this was why he was late).
In a September 2016 order, the ALJ found that it was undisputed that on 1 March 2016, Shaw was eighteen years old, and D.D. was thirteen years old. The ALJ also found that D.D.'s testimony was corroborated by the medical findings consistent with sexual assault, that Shaw's absence from school for a portion of the day strengthened the plausibility of D.D.'s statement, and that "the investigative record lacks evidence that Shaw has ever denied that he had sex with D.D." Consequently, the ALJ found sufficient evidence "that Petitioner engaged in sexual conduct and sexual intercourse with D.D. when he was eighteen (18) years old and when she was thirteen (13) years old, and therefore was sexual abuse." So the ALJ ordered that Shaw's name be listed on the Registry. Shaw appealed this decision to the Jefferson County Circuit Court, which affirmed the agency's decision in May 2017. An appeal to this court followed.
DHS is an "agency" as defined by the Administrative Procedure Act. See Ark. Code Ann. § 25-15-202(2)(A) (Supp. 2017). Review of administrative agency decisions by both the circuit court and appellate court is limited in scope. Ark. Dep't of Human Servs. v. Bixler , 364 Ark. 292, 219 S.W.3d 125 (2005). The standard of review to be used by both the circuit court and *929 the appellate court is whether there is substantial evidence to support the agency's findings. Id. This court reviews the administrative agency decision, not the circuit court's ruling. Id. The circuit court or appellate court may reverse the agency decision if it concludes
(h) [t]he substantial rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the agency's statutory authority;
(3) Made upon unlawful procedure;
(4) Affected by other error or law;
(5) Not supported by substantial evidence of record; or
(6) Arbitrary, capricious, or characterized by abuse of discretion.
Ark. Code Ann. § 25-15-212(h) (Repl. 2014).
Substantial evidence is valid, legal, and persuasive evidence that a reasonable mind might accept as adequate to support the agency decision. Ark. Prof'l Bail Bondsman v. Oudin , 348 Ark. 48, 69 S.W.3d 855 (2002). The challenging party must prove an absence of substantial evidence and must demonstrate that the proof before the administrative agency was so nearly undisputed that fair-minded persons could not reach its conclusion. Id. The question is not whether the evidence would have supported a contrary finding, but whether it supports the finding that was made. Id. This court may not simply substitute its judgment and discretion for that of the administrative agency. Bixler, supra. It is also the prerogative of the agency to believe or disbelieve the testimony of any witness and to decide what weight to give the evidence. Ark. State Police Comm'n v. Smith , 338 Ark. 354, 994 S.W.2d 456 (1999).
Shaw first argues that substantial evidence does not support the finding that he was the individual with whom D.D. had sex on 1 March 2016. He asserts: "C.O.'s testimony that Appellant was not the individual he saw in bed with D.D. eviscerates D.D.'s claim that Appellant was her sexual partner for the Christmas-break tryst and, by extension, eviscerates her claim that Appellant was her sexual partner on March 1, 2016." He also identifies other evidence that was not used to link him to D.D., such as phone records, social-media records, a description of his car by D.D., and the sexual-assault kit. And he cites discrepancies in what time he arrived at school and what time D.D. was picked up at the gas station as further proof that he was not with D.D. that morning. Shaw contends that fair-minded persons could not conclude that he was D.D.'s sexual partner on March 1.
Shaw also claims the ALJ's decision was arbitrary and capricious for two reasons. First, as part of his reasoning, the ALJ stated that "the investigative record lacks evidence that Shaw has ever denied that he had sex with D.D." Shaw contends this is incorrect and cites the statement given by Officer Brian Todd, which stated, "Jordan denied that he had been with DD and stated he did not know the girl and did not know what they were talking about." Second, the ALJ's decision made no mention of C.O.'s failure to identify Shaw as the man he saw in bed with D.D., "despite the fact that it completely discredited D.D.'s identification."
We hold that substantial evidence supports the agency's decision and that the decision is not arbitrary and capricious. Shaw has failed to prove the absence of *930 substantial evidence or to demonstrate that the proof before the agency was so nearly undisputed that fair-minded persons could not reach its conclusion. Shaw is essentially asking us to reweigh the evidence and to give C.O.'s testimony more weight and credibility; but it is the prerogative of the agency to believe or disbelieve the testimony of any witness and to decide what weight to give the evidence. We therefore affirm the agency's decision to place Shaw on the Registry.
Affirmed.
Gruber, C.J., and Brown, J., agree.